**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Criminal Action No. 24-cr-00170-NYW-1

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.    DANNY FAHRENKRUG,

     Defendant.

---

## ORDER ON MOTIONS TO SUPPRESS

---

Defendant Danny Fahrenkrug ("Defendant" or "Mr. Fahrenkrug") moves to suppress statements he made during a September 14, 2022 encounter with Thornton police and physical evidence Thornton police seized during two subsequent searches in September 2022 and August 2023. To that end, Mr. Fahrenkrug has filed the following Motions currently pending before the Court:

(1)    Motion to Suppress Statements [Doc. 34, filed January 2, 2025];

(2)    Motion to Suppress Evidence Seized Pursuant to a Search Warrant for the Defendant's Residence Dated September 2022 ("September 2022 Motion to Suppress Physical Evidence") [Doc. 36, filed January 2, 2025];

(3)    Motion to Suppress Evidence Seized Pursuant to a Search Warrant for the Defendant's Residence Dated August 2023 ("August 2023 Motion to Suppress Physical Evidence") [Doc. 37 filed January 2, 2025].

The Government opposes the Motions. *See* [Doc. 43; Doc. 44; Doc. 45]. Defendant did not file a reply brief or seek leave to do so, and the Parties withdrew their

request for an evidentiary hearing on the Motions.  [Doc. 52].  The Court took the Motions under advisement on April 25, 2025.  [*Id.*].  For the reasons set forth in this Order, the Motion to Suppress Statements and the Motions to Suppress Physical Evidence are respectfully **DENIED**.

**BACKGROUND**[1]

***September 2022 Arrest and Search.***  On September 14, 2022, Thornton Police Department officers ("TPD" or "officers") arrived at Mr. Fahrenkrug's residence at 12245 Grape Street to execute an arrest warrant issued for felony domestic violence stalking.  [Doc. 44-1 at 16:13:36–16:15:24].[2]  When TPD officers approached Mr. Fahrenkrug's residence, officers could see inside through the glass storm door.  [*Id.*].  When the officers rang the doorbell, Mr. Fahrenkrug's dog came to the door.  [*Id.* at 16:14:15–31].  Officers opened the exterior door and said, "hey Danny come here, get your dog."  [*Id.* at 16:14:09–22].  Defendant came to the door, officers informed him of the arrest warrant, he exited the residence, and officers handcuffed him.  [*Id.* at 16:14:15–55].  Officers knew that Defendant had a previous felony conviction for felony menacing, dated May 22, 1999, which prohibited Defendant from possessing firearms.  [Doc. 36 at ¶ 2].  Officers also knew Mr. Fahrenkrug had been involved in Hells Angels and had a reputation for being armed.  [Doc. 44-1 at 16:19:34–50].

When officers asked if anyone else was at the residence "for the dog", Mr. Fahrenkrug said he "could get someone."  [Doc. 44-2 at 16:14:50–16:15:54].  Officers

---

[1] The Court takes these facts, which do not appear to be in dispute unless otherwise noted, from the Parties' briefs and supporting exhibits.

[2] When citing to video exhibits, the Court cites to the timestamp appearing in the top right-hand corner of the video, rather than the timestamp displayed by the media player.

asked Mr. Fahrenkrug, "do you have your phone on you to make that call?"  [Doc. 44-1 at 16:14:50–56].  Mr. Fahrenkrug said no and asked officers, "can you walk with me" inside and to get the cellphone.  [Doc. 44-2 at 16:14:54–16:15:02].  An officer answered, "we can walk with you to get your phone and come right back out." [*Id.*].  Mr. Fahrenkrug asked, "what's the arrest for, sir?"  [Doc. 44-1 at 16:15:13–20].  An officer answered, "you have a warrant for stalking and domestic violence out of Longmont. It just dropped today." [*Id.*].  Then officers asked Mr. Fahrenkrug, "where's that phone at, man?" and Defendant nodded toward his door and says, "[c]an we walk up this way?"  [Doc. 44-2 at 16:15:30–39].  Officers entered the residence and while escorting Defendant into his house they saw a handgun on the stairs and ammunition on the kitchen table. [Doc. 44-1 at 16:15:43–56].  After Defendant directed officers to his cellphone, officers escorted Defendant out of the home, at which point Defendant asked officers, "when did [the arrest warrant] come out?"  [*Id.* at 16:15:56–16:16:42].

Officers moved Defendant to the driveway for a pat down search and asked Defendant what number in his cellphone he needed.  [*Id.* at 16:16:42–16:17:11].  One of the officers then asked Defendant if he had the handgun in his hands when he came down the stairs.  [*Id.* at 16:17:54–16:18:01].  Defendant said no, and he stated he did not know officers had arrived until he heard his dog barking.  [*Id.*].[3]  Mr. Fahrenkrug asked whether the charged offense was a "harassment[,]" and an officer explained the offense and related enhancements.  [*Id.* at 16:18:36–48].  Then, Mr. Fahrenkrug asked officers, "when was this filed – yesterday?" and "is it a felony or something?" and asked why there

---

[3] The Government concedes that the officers' question regarding the handgun was taken in violation of *Miranda* and does not seek to admit Defendant's response.  [Doc. 43 at 1 n.1].

were so many officers present for the arrest.  [*Id.* at 16:19:20–36].   Officers responded that multiple officers were present because Mr. Fahrenkrug's record showed a history of being involved with Hells Angels and they know he "ha[s] been armed in the past."  [*Id.* at 16:19:36–50].  The officer continued and said, "because of that history and that they know you have been armed in the past, they let us know," at which point Mr. Fahrenkrug interjected and said, "I'm typically armed, yeah." [*Id.* at 16:19:36–59].  Officers continued to explain what their Fugitive Apprehension Unit does and why there were so many officers present.  [*Id.*].

After arresting Mr. Fahrenkrug and transporting him to jail, TPD officers obtained a warrant to search Mr. Fahrenkrug's residence and executed the warrant later that same day at 8:50pm.  [Doc. 36 at ¶ 2]; [Doc. 36-1 at 5–6].  While searching the residence, officers seized two firearms.  [Doc. 36 at ¶ 2].

***August 2023 Search.***   On August 14, 2023, TPD obtained a second search warrant for Mr. Fahrenkrug's residence.  [Doc. 37 at ¶ 3; Doc. 37-1 at 27–30].  TPD obtained the warrant based on the belief that Kya Perez ("Ms. Perez") and Vania Bauer-Rivera ("Ms. Bauer-Rivera") lived with Defendant and were involved in a shooting in the area.  [Doc. 37 at ¶ 3; Doc. 37-1 at 6–7].  The shooting occurred on July 12, 2023 on the 12000 block of Washington Street in Thornton, Colorado.   [Doc. 37 at ¶ 3].   After identifying a man involved in the shooting, TPD officers spoke to him about a stolen vehicle.   [Doc. 37-1 at 3].   The man gave officers the names of several individuals implicated in stealing vehicles, including the names of Ms. Perez and Ms. Bauer-Rivera.  [*Id.* at 3–5].  The man believed that both women were living in a house near E. 123rd Avenue and Grape Street.  [*Id.* at 6].

After researching the information that officers obtained, the affiant of the warrant verified that Mr. Fahrenkrug owned the residence in question and that the residence had several complaints for the sale of drugs and firearms.  [Doc. 37-1 at 7].  At the time the affiant drafted the Affidavit, Defendant had an active arrest warrant for illegally possessing a firearm.  [*Id.*].  On July 20, 2023, officers surveilled Defendant's residence and saw two men and two women outside, one of whom they believed to be Ms. Bauer-Rivera.  [*Id.*]. On August 7, 2023, Ms. Perez said on a recorded jail call that she had moved her property out of Defendant's residence.  [*Id.* at 15].  On August 11, 2023, the affiant interviewed Ms. Bauer-Rivera at the Adams County jail.  [*Id.* at 16].  Ms. Bauer-Rivera told the affiant that she was living with an individual who the affiant believed to be Defendant based on the information Ms. Bauer-Rivera shared.  [*Id.*].  Ms. Bauer-Rivera shared that Defendant directed individuals to pick up drugs or guns for him and that they were then sold on Defendant's behalf.  [*Id.*].  Ms. Bauer-Rivera stated that she saw drugs, firearms, and stolen vehicles at Defendant's residence.  [*Id.* at 16–17].  The affiant researched this information and found that there were 14 reports of stolen vehicles parked at Defendant's address between February 12, 2023 and July 18, 2023.  [*Id.* at 19–21].   The warrant was issued August 14, 2023.  [*Id.* at 29].

Officers subsequently executed the search warrant and found the following inside Mr. Fahrenkrug's residence: "12 boxes of ammunition, a Polymer 80 PF9SS 9 MM handgun, 14 oxycodone pills, multiple quantities of methamphetamine having a total weight of 147.18 grams, Airsoft pellet guns, and Hell[]s Angels memorabilia."  [Doc. 37 at ¶ 3].

On May 15, 2024, the United States Attorney for the District of Colorado charged Mr. Fahrenkrug by Criminal Complaint with a single count of Possession of Ammunition by a Prohibited Person in violation of 18 U.S.C. § 922(g)(1).  [Doc. 1].  He was subsequently indicted on four felony counts:  (1) Possession of a Firearm/Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1); (2) Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); (3) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and Possession of Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1).  [Doc. 13].

## LEGAL STANDARDS

### I.   Fifth Amendment Principles

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "The Fifth Amendment affords citizens the right to remain silent, to have an attorney present, and to be informed of these rights when the individual is both (1) in custody and (2) subject to interrogation by police."  *United States v. Woody*, 45 F.4th 1166, 1176 (10th Cir. 2022). As such, prior to a custodial interrogation, a suspect must be warned that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  "Without these warnings, custodial confessions are presumed to be the product of coercion and are generally inadmissible for purposes of

the prosecution's case in chief." *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021).

## II.    Fourth Amendment Principles

The Fourth Amendment to the United States Constitution "protects the people from unreasonable searches and seizures of 'their persons, houses, papers, and effects.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 62 (1992) (quoting U.S. Const. amend. IV).  "For a search . . . to be reasonable, it must ordinarily be supported by a warrant based on probable cause," *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021), and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment," *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation omitted).  A warrantless search "is reasonable only 'if it falls within a specific exception to the warrant requirement.'"  *United States v. Kendall*, 14 F.4th 1116, 1121–22 (10th Cir. 2021) (quoting *United States v. Venezia*, 995 F.3d 1170, 1174 (10th Cir. 2021)).  The Government bears the burden of demonstrating that an exception to the warrant requirement applies.  *Chavez*, 985 F.3d at 1240.

## ANALYSIS

## I.   The Motion to Suppress Statements

Mr. Fahrenkrug moves to suppress the "statements [he] made after being placed in custody," arguing that he had not received a *Miranda* advisement.  [Doc. 34 at ¶¶ 9–10].  Defendant further asserts that TPD officers "overbore [his] free will and critically impaired his ability to determine whether he should speak with police."  [*Id.* at ¶ 11].  Defendant's Motion to Suppress does not specify which particular statements he seeks to suppress other than when he said "he is normally armed with a handgun at all times."

[*Id.* at ¶ 2].  *See generally* [*id.*].   In response, the Government contends that Mr. Fahrenkrug was not subjected to custodial interrogation when he made the statement that he is "typically armed" and he made his statements voluntarily.  [Doc. 43 at ¶¶ 20–22].

###### A.    Custodial Interrogation

As discussed above, a defendant has the "right to remain silent, to have an attorney present, and to be informed of these rights when the individual is both (1) in custody *and* (2) subject to interrogation by police."  *Woody*, 45 F.4th at 1176 (emphasis added).   Mr. Fahrenkrug moves to suppress statements he made during his arrest, arguing he was in custody when he "encounter[ed] police at his residence" because he was "placed into handcuffs and his movements were restricted by officers."  [Doc. 34 at ¶ 4].  The Government does not dispute that Mr. Fahrenkrug was in custody when he said he is "typically armed."  [Doc. 43 at ¶ 10; Doc. 44-1 at 16:19:36–59].  But the Government contends that Mr. Fahrenkrug's statement was not "the product of an interrogation" because "there was no express questioning of [Defendant]" nor was Defendant "subjected to the 'functional equivalent' of questioning" because he was "calm, coherent, and talkative during his arrest."  [Doc. 43 at ¶¶ 10, 13].

Interrogation is "either express questioning or its functional equivalent" and can include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980).  The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has concluded that "interrogation extends *only* to words or actions that the officers should have known were

reasonably likely to elicit an incriminating response." *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013) (citing *Fox v. Ward,* 200 F.3d 1286, 1298 (10th Cir. 2000)). When determining if an officer's conduct rises to interrogation, the Court "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301. An officer's statements and "conduct [that are] attendant to arrest and custody" typically do not constitute an interrogation. *See United States v. Comosona,* 848 F.2d 1110, 1112–13 (10th Cir. 1988) (concluding officer's suggestion to defendant to call him collect to discuss incident constituted conduct normally attendant to arrest). "By its plain terms, *Miranda* only applies to 'questioning *initiated by law enforcement officers* after a person has been taken into custody.'" *Cash*, 733 F.3d at 1278. For example, in *United States v. Roman-Zarate*, the defendant initiated conversation with law enforcement and the court concluded that the defendant "was not subject[ed] to interrogation in violation of *Miranda*." 115 F.3d 778, 782 (10th Cir. 1997).

Like in *Roman-Zarate*, Mr. Fahrenkrug initiated communication with officers by asking what the arrest was for, [Doc. 44-1 at 16:15:13–20], asking when the warrant was issued, [*id.* at 16:19:20–36], and whether the offense was a felony, [*id.*]. Body-worn camera footage demonstrates that Defendant initiated and continued the conversation with officers. *See* [*id.* at 16:14:50–16:20:25]. Rather than officers asking Mr. Fahrenkrug specific questions, Mr. Fahrenkrug interrupted officers when he said, "I'm typically armed,

yeah." [*Id.* at 16:19:36–59]. Based on these facts, the Court concludes that Mr. Fahrenkrug was not subject to interrogation for the purposes of *Miranda*.

Because Defendant was not being interrogated, Defendant's Fifth Amendment rights had not attached, and accordingly, a *Miranda* advisement was unnecessary.

### B. Voluntary Statement

Mr. Fahrenkrug also argues that "[s]hould the Government claim that . . . . Defendant's statements were nonetheless voluntarily made, law enforcement overbore [his] free will and critically impaired his ability to determine whether he should speak with police." [Doc. 34 at ¶ 11]. As a result, Mr. Fahrenkrug asserts that his statements were the "product of coercive law enforcement activity" and therefore should be suppressed. [*Id.* at ¶ 10]. Defendant's Motion to Suppress does not argue any further facts that indicate how officers "overbore [Defendant's] free will." *See generally* [*id.*]. The Government argues that Defendant made his statements voluntarily and there was an "obvious absence of coercive conduct," [Doc. 43 at ¶ 20], and that Defendant "is an adult with no evidence of mental disability. . . . [who] has experience with the criminal justice system. . . . [and] actively engaged [officers] by asking questions," [*id.* at ¶ 21].

"[E]ven when a confession is not obtained in violation of *Miranda*, it must nonetheless be voluntary to be admissible." *Cash*, 733 F.3d at 1280 n.12. A confession is voluntary if it was "the product of an essentially free and unconstrained choice by its maker." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (quotation omitted). On the other hand, a confession is involuntary—and cannot be used against the defendant—if "law enforcement overbore the defendant's free will and critically impaired the defendant's capacity for self-determination." *United States v. Pena*, 115 F.4th 1254,

1261 (10th Cir. 2024) (quotation omitted).  Courts look to the totality of the circumstances to determine if a statement is voluntary and consider several non-dispositive factors.  *Id.* Those factors include:  the use or threat of physical punishment, whether the defendant received *Miranda* warnings, the place and time at which the interrogation occurred, the length of detention, and the nature of the police questioning.  *See, e.g.*, *United States v. Chalen*, 812 F.2d 1302, 1307–08 (10th Cir. 1987) (concluding that the defendant "could not reasonably have believed that he was in custody during the interview" when considering the lack of force used to make defendant attend the interview, his voluntary willingness to attend the interview, and other circumstances).  The government bears the burden of demonstrating, by a preponderance of the evidence, that a confession was voluntarily made.  *Lopez*, 437 F.3d at 1063.

As discussed above, Mr. Fahrenkrug initiated conversation with officers by asking about the warrant, [Doc. 44-1 at 16:15:13–20], asking when the warrant was issued, [*id.* at 16:19:20–16:19:36], and whether the offense was a felony, [*id.*].  Body-worn camera footage demonstrates that Defendant initiated and continued the conversation with officers.  *See* [*id.* at 16:14:50–16:20:25].  Although Mr. Fahrenkrug had not yet received a *Miranda* advisement, officers had not threatened him with physical punishment, the conversations took place in Defendant's driveway rather than a police interrogation room, the conversation lasted no more than ten minutes and occurred shortly after Defendant's arrest, and officers were responding to Defendant's questions before he offered that, "I'm typically armed, yeah."  *See* [*id.* at 16:14:11–16:20:33].  Although Defendant alleges that officers' tone was "aggressive" and that they "overbore [his] free will," Defendant does not discuss any facts that suggest coercive behavior and the body-worn camera footage does

not suggest as much either.  *See* [*id.*].  Based on these facts and the totality of the circumstances, the Court concludes that Defendant's statement that he is "typically armed" was voluntary.

Therefore, because Defendant has not demonstrated any Fifth Amendment violations, the Motion to Suppress Statements is respectfully **DENIED**.

## II.    The September 2022 Motion to Suppress Physical Evidence

Mr. Fahrenkrug moves to suppress physical evidence that TPD officers seized pursuant to a search warrant on September 14, 2022, shortly after Defendant's arrest. *See generally* [Doc. 36].  The party challenging the warrant, i.e., Defendant, bears the burden of overcoming the presumption of probable cause.  *See United States v. Peveto*, 881 F.2d 844, 850–51 (10th Cir. 1989).  Probable cause exists if "the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that the person or property was involved in the crime."  *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (quotation omitted).  The relevant inquiry is whether there was a "substantial probability" that the "property was involved in a crime."  *Id.* (quotation omitted).

Rather than a calculation of certainties, the probable cause inquiry focuses on "probabilities and . . . common sense conclusions."  *United States v. Orr,* 864 F.2d 1505, 1508 (10th Cir.1988).  A judge considering a warrant must decide whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  At the motion-to-suppress stage, the Court must "review[] the sufficiency of the affidavit upon which a warrant is issued by looking at

the totality of the circumstances and simply ensur[e] that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011) (quoting *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001)).

Here, Defendant argues that because the handgun and ammunition that officers saw in his home were the result of a nonconsensual search, their basis for probable cause for the search warrant was "unconstitutionally obtained." [Doc. 36 at ¶¶ 10–11]. Without the inclusion of the two firearms in the affidavit supporting the September 2022 warrant, Mr. Fahrenkrug contends that the search warrant lacks probable cause, and the evidence obtained through the search warrant should therefore be suppressed. [*Id.* at ¶ 13]. In response, the Government contends that Defendant voluntarily consented to the officers' entrance into his home and the items were in plain view when officers entered Defendant's home. [Doc. 44 at ¶¶ 4, 8]. As a result, the Government asserts that evidence of the firearms should not be suppressed. [*Id.* at ¶ 17].

***Entry Into Defendant's House.*** Unconstitutionally obtained material cannot provide probable cause to issue a search warrant. *See United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005). Although warrantless entry into a home is presumptively unreasonable, "[v]oluntary consent is a longstanding exception to the general requirement that law enforcement officers must have a warrant to enter a person's home." *Guillen*, 995 F.3d at 1103; *see also Schneckloth v. Bustamente*, 412 U.S. 218, 219, 222 (1973) ("[A] search authorized by consent is wholly valid."); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) ("The prohibition [against warrantless searches] does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose

property is searched, or from a third party who possessed common authority over the premises." (citation omitted)).  "The exception applies when the government proves (1) the officers received either express or implied consent and (2) that consent was freely and voluntarily given."  *Guillen*, 995 F.3d at 1103.

Courts determine whether consent is voluntary under the "totality of the circumstances."  *United States v. Carbajal-Iriarte*, 586 F.3d 795, 799 (10th Cir. 2009). The Tenth Circuit also considers the following factors (among others):  physical mistreatment, use of violence, the physical and mental condition and capacity of the defendant, the number of officers on the scene, the display of police weapons; and whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a lawful claim of authority, or informs a defendant of his right to refuse consent.  *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012).  "A person may voluntarily consent to a search even while being legally detained," *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007), and "simply . . . being arrested and handcuffed" does not show coercion, *United States v. Silva-Arzeta*, 602 F.3d 1208, 1215 (10th Cir. 2010).

Mr. Fahrenkrug contends that his consent to an officer in his home was involuntary because he was in custody, officers took "an initially aggressive tone with him[,]" and "there were multiple officers at the scene of his arrest."  [Doc. 36 at ¶ 10].  In response, the Government argues that "only three officers were present with and visible to the defendant. . . . and nothing indicates that their presence made Defendant ask the officers to enter his home because '[h]e felt coerced, frightened or otherwise threatened.'"  [Doc. 44 at ¶ 8] (quoting *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993)).

First, although several officers were present at Mr. Fahrenkrug's arrest, this factor alone does not guarantee that his consent was involuntary.  *See Iribe*, 11 F.3d at 1557 (holding that the district court clearly erred when it found consent involuntary based on the presence of five officers because numerous factors indicated the resident voluntarily consented); *Guillen*, 995 F.3d at 1105 ("The presence of multiple officers at the time [a defendant] consent[s] increase[s] the coercive nature of the encounter, but that factor is not dispositive.").  In *Iribe*, the defendant was not coerced, frightened or otherwise threatened; she had a cordial conversation with officers spoken in low volume; and the officers made no promises or threats in an attempt to extract her consent.  *Iribe*, 11 F.3d at 1557.  Similarly, officers did not threaten Mr. Fahrenkrug, and Mr. Fahrenkrug conversed with them cordially at a low volume.  [Doc. 44-2 at 16:15:34–16:17:05].

Second, officers did not threaten Mr. Fahrenkrug verbally or physically.  Mr. Fahrenkrug alleges that officers took an "aggressive tone[,]" but identifies no support for that conclusion.  *See* [Doc. 36 at ¶ 10].  The body-worn camera footage verifies that Mr. Fahrenkrug led officers into his home, directed them where to go, and thanked them after they locked his front door.  [Doc. 44-2 at 16:15:34–16:17:05].  Further, officers did not point firearms at Mr. Farhrenkrug, did not raise their voices to him, and did not order him to take any action.  *See* [Doc. 44-1 at 16:14:15–16:20:33].

Third, to the extent that Mr. Fahrenkrug contends that law enforcement agents were required to inform he had the right to refuse consent to allow police to enter his home, [Doc. 36 at ¶ 10], he is incorrect.  Officers telling Defendant that he has the right to refuse consent is not "necessary prerequisite to demonstrating a voluntary consent." *Schneckloth*, 412 U.S. at 232–33.  Although officers did not inform Mr. Fahrenkrug of his

right to refuse consent, they also did not ask him to enter his home; instead, he invited them in once he determined that he did not have a cellphone to contact a caregiver for his dog. *See* [Doc. 44-2 at 16:14:37–16:15:02]. Indeed, officers informed Mr. Fahrenkrug at the outset of his arrest that he needed to exit his house because officers did not have a search warrant and were not there to search the house. *See* [Doc. 44-1 at 16:14:34–38 ("We do not have a search warrant, so we're not searching the house okay?")]; *see also United States v. Lambert*, 356 F. App'x 179, 186 (10th Cir. 2009) ("In any case, it appears Lambert was aware she did not have to allow the officers to search her belongings.").

Fourth, Mr. Fahrenkrug requested that officers accompany him back into his home to retrieve his cellphone which served as an invitation for officers to enter. [Doc. 44 at ¶ 9]. The Tenth Circuit has concluded that consent can be voluntary if an individual invites officers into his space. *Lambert*, 356 F. App'x at 186 (finding that consent to search motel room was voluntary where, among other things, "officers did not ask to enter Lambert's motel room" but instead, it was "Lambert who invited the officers to enter her room"); *see also United States v. Rosborough,* 366 F.3d 1145, 1149 (10th Cir. 2004) (concluding defendant's consent to the search of his vehicle was voluntary where, *inter alia,* the officer did not ask defendant for consent to search; "to the contrary, [the defendant] himself volunteered permission to [the officer] to search his car").

Based on the record before it, this Court concludes that Mr. Fahrenkrug voluntarily consented to allowing officers into his home. Mr. Fahrenkrug's sole argument for excluding from the probable cause analysis the ammunition and the firearm officers saw while accompanying him back into his house is that they constitute unconstitutionally

obtained "fruit of the poisonous tree." [Doc. 36 at ¶¶ 7, 11, 13]. Having found that Defendant voluntarily consented to allowing the officers into his home, the Court finds that this argument necessarily fails, and Mr. Fahrenkrug has failed to carry his burden of demonstrating that the warrant lacked probable cause.[4] Accordingly, the Motion to Suppress Physical Evidence is respectfully **DENIED**.

## III.    The 2023 Motion to Suppress Physical Evidence

Mr. Fahrenkrug also moves to suppress physical evidence seized at his residence subject to the August 2023 warrant. *See generally* [Doc. 37]. The August 2023 warrant is supported by an Affidavit sworn by Detective Jessica Kvitek, a TPD officer. [Doc. 37-1]. When considering a warrant to search a residence, an issuing judicial officer must consider the "facts of each case" and determine if a "sufficient nexus has been established between a defendant's suspected criminal activity and his residence." *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009). In determining the strength of the nexus, courts consider several factors, including the opinion of law enforcement officers "as to where contraband may be kept," *United States v. Hargus,* 128 F.3d 1358, 1362 (10th Cir.1997), as well as "the type of crime at issue, . . . the extent of the suspect's opportunity for concealment, . . . the nature of the evidence sought, and . . . .    all

---

[4] Mr. Fahrenkrug does not argue that the firearm and ammunition was not within the plain view of the officers who entered his home on September 14, 2022. *See* [Doc. 36]. Nor could he, given the unequivocal body-worn camera footage. *See* [Doc. 44-1 at 16:15:43–56].

reasonable inferences as to where a criminal would likely keep such evidence," *United States v. Mora*, 989 F.3d 794, 801 (10th Cir. 2021) (citing *Biglow*, 562 F.3d at 1279).

Mr. Fahrenkrug argues that there was not a "substantial nexus between the crimes alleged in the affidavit and Defendant's home" and moves to suppress on that basis. [Doc. 37 at 4]. In response, the Government contends that there was "ample probable cause to believe that the items sought in the warrant would be located at [D]efendant's residence." [Doc. 45 at ¶ 18]. The Government argues that Defendant's criminal history, the statements from multiple sources regarding illegal activity at Defendant's residence, and the months of criminal activity occurring at the residence were sufficient to justify probable cause. [*Id.*].

As an initial matter, while Defendant alleges that a "substantial" nexus is necessary, the affidavit need only demonstrate a "sufficient" nexus between a defendant's residence and alleged criminal activity. *Biglow*, 562 F.3d at 1279. Upon review of the Affidavit, the Court concludes that the facts alleged reflect a sufficient nexus. First, officers interviewed an individual who identified Ms. Perez as an individual involved in a shooting of him on July 18, 2023; advised that she was living in a house near "E.123rd Avenue and Grape Street in Thornton;" indicated that Ms. Perez was also supplying a third party with fentanyl; and the house she was staying had a lot of guns. [Doc. 37-1 at 4–7]. Ms. Perez was also later connected with a purse and fingerprints left in a stolen F-350, which bore a front plate involved in the July 18, 2023 shooting. [*Id.* at 8–9]. Ms. Perez was later observed walking from a stolen red Dodge Ram in the general direction of 12245 Grape Street, Thorton, Colorado, and stolen red Dodge Ram was later observed in the driveway of 12245 Grape Street by a law enforcement officer. [*Id.* at 11–12].

Officers identified Mr. Fahrenkrug as the owner of 12245 Grape Street through law enforcement databases. [*Id.* at 7].

Law enforcement officers undertook surveillance of 12245 Grape Street and Mr. Fahrenkrug, who was observed as a passenger in the stolen red Dodge Ram on July 26, 2023. [*Id.* at 12]. On August 3, 2023, during surveillance at 12245 Grape Street, law enforcement officers observed an alleged supplier of illegal narcotics roll a stolen motorcycle into the garage of the home. [*Id.*]. Ms. Perez was overheard saying that she had gotten in an altercation with someone in the home, and Mr. Fahrenkrug had come downstairs with his "thing," which Officer Kvitek understood to likely refer to a firearm. [*Id.* at 15]. Through investigation including a long-term surveillance operation on August 10, 2023, Officer Kvitek concluded that Ms. Bauer-Rivera was possibly also living with Ms. Perez at 12245 Grape Street. [*Id.* at 6, 16]. During an interview on August 11, 2023, Ms. Bauer-Rivera confirmed that she was living with "Dan" at his house in Thornton until two weeks prior; that Danny would direct other individuals (including Ms. Perez) to "go pick up drugs or guns for him"; and that Defendant sold methamphetamine, fentanyl, and guns. [*Id.* at 16]. Importantly, Ms. Bauer-Rivera also indicated that some people would come to the residence to purchase guns or illegal narcotics, and that she had seen up to one pound of methamphetamine, 1,000 pills of fentanyl, and numerous guns within the residence. [*Id.* at 16–17]. Between February 12, 2023 and July 18, 2023, Officer Kvitek was able to identify 14 reports related to stolen motor vehicles, recovered stolen vehicles, or similar reports directly related to the address. [*Id.* at 19].

The fact that Ms. Perez and Ms. Bauer-Rivera had moved out of Defendant's residence by August 11, 2023, [*Id.* at 15–16], is simply not dispositive. And Defendant's

suggestion that the August 2023 search warrant was connected (and thus somehow limited to) the July 12, 2023 shooting involving Ms. Perez and Ms. Bauer-Rivera is inaccurate. Irrespective of whether Ms. Perez or Ms. Bauer-Rivera were actively living at the residence, the relevant inquiry is whether there was a "substantial probability" that *12245 Grape Street* was involved in a crime. *Patel*, 849 F.3d at 981. Upon review of the Affidavit, including but not limited to the averments set forth above, the Court respectfully concludes that there was a substantial probability that 12245 Grape Street was involved in a crime.

Because Defendant has not demonstrated any Fourth Amendment violations, the 2023 Motion to Suppress Physical Evidence is respectfully **DENIED**.

## CONCLUSION

For the reasons set forth above, it is **ORDERED** that:

(1)     The Motion to Suppress Statements [Doc. 34] is **DENIED**;

(2)     The Motion to Suppress Evidence Seized Pursuant to a Search Warrant for the Defendant's Residence Dated September 2022 [Doc. 36] is **DENIED**;

(3)     The Motion to Suppress Evidence Seized Pursuant to a Search Warrant for the Defendant's Residence Dated August 2023 [Doc. 37] is **DENIED**; and

(4)     On or before **May 23, 2025**, the Parties shall meet and confer with respect to the requirements of the Speedy Trial Act and shall file a joint status report setting forth their position(s) as to the applicable Speedy Trial Act date, for purposes of resetting the trial.

DATED: May 19, 2025                    BY THE COURT:

Nina Y. Wang
United States District Judge